[No. 16505.  *En Banc.*  August 18, 1921.]

## In the Matter of the Application of LETTIE WILLIAMSON for a Writ of Habeas Corpus.[1]

STATES (26)—APPROPRIATION—NECESSITY—EFFECT OF FAILURE TO
MAKE.  Where, through the failure to make an appropriation, the
operation of the Women's Industrial Home and Clinic, to which
certain classes of female offenders were to be sentenced, was sus-
pended, the requirement of the act that convicted offenders be sen-
tenced to such institution was likewise suspended, thereby subject-
ing such class of offenders to the operation of the general laws
which provide for the imprisonment of persons convicted of crimes.

STATUTES (51)—REPEAL—REVIVAL OF ACT REPEALED—EXCEPTIONS.
Where an original statute is left in force on the passage of a subse-
quent act, which modifies it only to the extent of excepting certain
cases from its operation, the taking away of the exception by sus-
pension or repeal revives the original statute, which continues in
force to be applied without the exception; since the rule against re-
vival of a statute by the repeal of a repealing statute relates to
absolute repeals only.

STATES (3, 25, 26)—LIABILITY—POWER TO INCUR DEFICIENCY—AP-
PROPRIATIONS.  An administrative officer charged with the manage-
ment and control of a reformatory institution, for which the legis-
lature has failed to make an appropriation for maintenance, is un-
der no obligation to incur a deficiency to continue its operation; in
view of Rem. Code, §§ 5025-5027, which prohibit expenditures in
excess of appropriations and provide that the officer making such
expenditures is guilty of misdemeanor and liable personally and on
his official bond for the amounts so expended.

HABEAS CORPUS (21, 24, 25)—PROCEEDINGS—JUDGMENT—DISPOSI-
TION OF PERSON—DISCHARGE.  On an original application in the
supreme court for a writ of habeas corpus directed to the officer
who has a petitioner in custody, that court, being without authority
to direct by mandate the proper sentence to be rendered, should
order the officer having the petitioner in charge to take her before
the court in which she was convicted for a proper sentence, and
that she should be discharged if no further action be taken by the
lower court (TOLMAN, HOLCOMB, and MITCHELL, JJ., dissenting).

Application filed in the supreme court April 27, 1921,
for a writ of habeas corpus to release the petitioner

[1]Reported in 200 Pac. 329.

from the county jail of Spokane county, after conviction and sentence to the women's industrial home and clinic. Denied.

*Richard S. Munter* and *Munter & Munter,* for petitioner.

*T. T. Grant,* for respondent.

*The Attorney General* (*Nat U. Brown,* of counsel), *amicus curiae.*

Fullerton, J.—The legislature, at its biennial session of 1919, provided for the creation of a penal institution to be known as the "Women's Industrial Home and Clinic." (Laws of 1919, p. 570, ch. 186.) The act, as expressed in its title, was designed to provide a place. for the "custody, training and treatment of delinquent and diseased women." The body of the act was somewhat broader than its title indicated. Aside from a few excepted instances, it provided for the confinement therein of all women convicted of crime in any of the courts of the state exercising criminal jurisdiction,. whether felonies, gross misdemeanors, or misdemeanors, and whether the convicted woman was diseased or otherwise. The remainder of the act related to the erection, management and control of the institution. It provided for the appointment of a board of directors, and imposed upon such board the duty of selecting a site for the institution, erecting suitable buildings thereon, and selecting its officers and employees, who should have immediate charge of the inmates committed to the institution. The act also provided that, when the institution should be ready for the reception of inmates, the board should so certify to the governor, and made it the duty of that officer to issue a public proclamation to that effect. The act also

provided somewhat minutely for the care and treatment of the women sentenced to it, and the conditions upon which its inmates could be paroled or discharged therefrom. The act created no new offenses, nor any new methods or modes of trial, nor did it on its face repeal, or purport to repeal, any of the existing general statutes relating to crimes and their punishment. The specific provision relating to the persons who should be sentenced thereto reads as follows:

"From and after the proclamation of the governor, provided for in section 4 of this act, all women over sixteen years of age belonging to any of the following classes sentenced to imprisonment by any court of criminal jurisdiction may be committed to and confined in, and all women over eighteen years of age belonging to any of the following classes sentenced to imprisonment by any court of criminal jurisdiction must be committed to and confined in said institution:

"First: Women convicted of or who plead guilty to the commission of felonies, except murder in the first and second degree, arson in the first degree, and robbery, who have not been twice before convicted in this state or elsewhere of crimes which under the laws of this state would amount to felonies.

"Second: Women convicted of or who plead guilty to the commission of gross misdemeanors or misdemeanors as defined by law.

"The court imposing sentence on offenders of either of the above classes shall not fix the time of such commitment. Commitment to such institution shall be executed, within one week after sentence is imposed, by a woman guard appointed by the court for that purpose or sent from said institution on notice of the issuance of the commitment. The expenses of such commitment shall be paid in the same way as commitment to other penal institutions of the state. The trial court shall cause a record of the case to be sent with commitment papers on blanks furnished by the institution.

"Any girl between the ages of sixteen and eighteen years who shall be found to be delinquent or dependent under the provisions of chapter 160 of the laws of 1913, may be committed to said institution, and if committed, the commitment shall be executed by a juvenile officer, or a woman guard from said institution.

"The duration of such commitment for Class 1, including the time spent on parole, shall not exceed the maximum term specified by law for the crime for which the offender was sentenced, and in such cases it shall be the duty of the trial court to specify the maximum term for which the offender may be held under commitment.

"The duration of such commitment for all other classes shall not exceed three years unless, in the opinion of a board of experts composed of one jurist and two physicians one of whom shall be a recognized neurologist, a longer detention shall be recommended.

"If, through oversight or otherwise, any person be sentenced to confinement in said institution for a definite period of time, such sentence shall not for that reason be void but the persons so sentenced shall be entitled to the benefits and subject to the liabilities of this act in the same manner and to the same extent as if sentence had been given in the terms required by this section; and in such cases said board of directors shall deliver to such offender a copy of this act and written information of her relation to said board.

"Immediately upon the arrival of any person committed to said institution a careful physical and mental examination of such person shall be made by a competent physician."

In the act authorizing the institution, the legislature appropriated sufficient funds for its maintenance during the ensuing biennium. At its biennial session in 1921, however, it failed to make an appropriation for the coming biennium, and as a result thereof the institution was closed on April 1, 1921, for want of funds for its support.

On April 8, 1921, after the institution had been closed, one Lettie Williamson was convicted in the superior court of Spokane county of the crime of adultery, and was by that court committed to the institution for a term not exceeding two years. There being no way of carrying the commitment into effect, the convicted woman is now held in the county jail of Spokane county by the sheriff of that county. The proceeding now before us is an original application made in her behalf to this court for a writ of habeas corpus, seeking her discharge from custody.

Basing his argument upon the contention that the provisions of the act relating to the classes of women who are required by the act to be sentenced to the institution have existence independent of the existence of the institution itself, the petitioner's counsel argues that it is the mandatory duty of the courts to sentence all women offenders convicted of crime to the institution; and, since the institution is closed for the reception of inmates, there is no other remedy to pursue than to discharge the convicted person from custody. Doubtless, if we were to accept as sound the contention made, we would be compelled to accept the conclusion drawn therefrom. We cannot, however, think the contention tenable. Appropriation bills of a legislature are laws, as all other constitutional enactments of a legislature, are laws. While they are limited in duration by reason of constitutional provisions, yet, during the period of their existence, they have the same force and effect as do laws of unlimited duration. When, therefore, the legislature fails to make an appropriation for an institution of its own creation, that is to say, an institution the existence of which depends solely upon its own will, its failure operates to suspend the operation of the institution as effectually as

it would were an express declaration made to that effect. Again, an act of the legislature, which denounces as a crime the doing of some particular thing by an individual but prescribes no penalty for the crime, or if it prescribes a penalty and provides no means of carrying the penalty into execution, is, in effect, in so far as the criminal courts are concerned, no law. Courts are not required to do useless or senseless things. They need not so waste their time, or the state's substance, as to enter upon the trial of an offender when the result of the trial, whether a conviction or an acquittal, must end in an absolute discharge. It it apparent, also, that the particular act here in question is a special, rather than a general law. As we have said, it creates no new offenses. All that it does is to select from the general class of offenders a particular class and provide that this particular class shall be punished by commitment to the institution. It must follow necessarily, we conclude, that the provision of the act requiring a commitment to the institution is so far dependent upon the maintenance of the institution that the one cannot exist as law without the other, and that the suspension of the operation of the institution suspends the requirement that convicted offenders be sentenced to it; this for the manifest reason that a law which as a whole is without sanction can have no sanction in its separate and individual parts.

It is argued, however, that this conclusion leaves the matter where it was before; that the act operated to suspend the general statutes in so far as it conflicted with them, and that these statutes are not revived by the suspension of the suspensatory act. But the rule is otherwise. The rule against the revival of a statute by the repeal of a repealing statute relates to absolute repeals only, and not to instances where the statute is

left in force and all that is done in the way of repeal is to except certain cases from its operation. In such instances, the original statute does not need to be revived, for it remains in force, and the exception being taken away, the statute is to be applied without the exception. 25 R. C. L. 934. See, also, *Manchester Township Supervisors v. Wayne County Commissioners*, 257 Pa. St. 442, 101 Atl. 736, Ann. Cas. 1918 B 278, and the note thereto, where the cases will be found collected.

Another matter is proper to be noticed. In a proceeding presenting somewhat similar features to the one here presented, it was argued that the officer in whom the law now vests the management and control of the state institutions is obligated to maintain this institution, notwithstanding the legislature has failed to appropriate the necessary funds for that purpose and notwithstanding he must incur a deficiency in so doing, and from this the conclusion is drawn that the institution is a going concern, and that the requirement that certain persons be committed thereto is still operative. But it is a sufficient answer to say that the maintenance of any state institution, not required by the higher authority to be maintained, rests in the will of the legislature, not in the will of the executive officers whose duty it is to execute the legislative will. Further than this, the argument overlooks the provisions of the law relating to the expenditure of money for the maintenance of a public institution in excess of the amount appropriated by the legislature therefor. Rem. Code, §§ 5025, 5026 and 5027. By these provisions not only are such expenditures positively prohibited, but the officer causing the expenditure is made guilty of misdemeanor, and is made liable personally and liable upon his official bond for the amounts so

expended. In view of these positive prohibitions of the statute, it is at least doubtful whether an officer can create a liability against the state by expending money in excess of an appropriation; but be this as it may, surely it ought not to be held that it is his duty so to do contrary to the provisions of a positive law. It is true that the legislature (Laws of 1921, p. 16, ch. 7, § 15, subd. 7), sought to empower the administrative board to authorize the incurring of a deficiency when a necessity exists therefor, but it is a sufficient answer to. any argument based upon this clause of the statute to say that the board has suffered this institution to be closed without action looking to its continued maintenance.

From these considerations, it follows that the trial court before whom the petitioner was convicted was without authority to sentence her to this institution, and that it should have sentenced her to that punishment provided by the general statutes for the offense of which she was convicted. Since, however, this proceeding is an original application made to this court directed to the officer who has the petitioner in custody, this court has no authority to direct by mandate the proper sentence to be made. The order will be, therefore, that the officer having the petitioner in charge take the petitioner before the court in which she was convicted for a proper sentence, and if no further action be taken by the court, that she be discharged.

PARKER, C. J., MACKINTOSH, BRIDGES, and MAIN, JJ., concur.

TOLMAN, J. (dissenting)—I cannot agree with the views expressed by the majority. The act referred to, in positive terms requires:

"From and after the proclamation of the governor, provided for in section 4 of this act, all women over six-

teen years of age belonging to any of the following classes sentenced to imprisonment by any court of criminal jurisdiction may be committed to and confined in, and all women over eighteen years of age belonging to any of the following classes sentenced to imprisonment by any court of criminal jurisdiction must be committed to and confined in said institution:

"First: Women convicted of or who plead guilty to the commission of felonies, except murder in the first and second degree, arson in the first degree, and robbery, who have not been twice before convicted in this state or elsewhere of crimes which under the laws of this state would amount to felonies.

"Second: Women convicted of or who plead guilty to the commission of gross misdemeanors or misdemeanors as defined by law." Laws 1919, p. 574, ch. 186, § 9.

Consequently this act, complete in itself, superseded all prior law upon this subject. The legislature did make an appropriation for the maintenance of this institution, and after its final adjournment the governor vetoed such appropriation, except as to the sum of $5,000, for the maintenance of the buildings, thus causing the institution to close. While admitting the governor's power to veto an appropriation, I cannot consent to the idea that by such veto the governor can, in effect, repeal prior properly enacted, positive statutory provisions for the punishment of crime. In my judgment, the petitioner is entitled to her discharge, and I therefore dissent.

MITCHELL, J., concurs with TOLMAN, J.

HOLCOMB, J. (dissenting)—I concur with the views of Judge Tolman, and would add that the law is universal that a sentence by a court that does not comply with the statute providing for sentence is void. The majority will now have courts sentencing women to

places forbidden by statute for certain classes of women to be committed.

This decision is judicial legislation, reviving laws that the legislature superseded and never intended to be revived.